IN RE the MARRIAGE OF:

Jane E. CHEN, Petitioner-Respondent,

v.

John J. WARNER, Respondent-Appellant.†

Court of Appeals

*No. 03–0288. Submitted on briefs August 13, 2003.—Decided May 6, 2004.*

2004 WI App 112

(Also reported in 683 N.W.2d 468.)

† Petition to review granted 9-16-04.

443

[redacted]

D<small>YKMAN</small>, J., dissents.

[redacted]

On behalf of the respondent-appellant, the cause was submitted on the briefs of *Linda Roberson, Anthony J. Lucchesi,* and *Laurel A. Kent* of *Balisle & Roberson, S.C.*, Madison.

On behalf of the petitioner-respondent, the cause was submitted on the brief of *James Kurth* of *James Kurth, S.C.*, Wausau.

Before Dykman, Vergeront and Lundsten, JJ.

¶ 1. LUNDSTEN, J. This is a child support modification case in which one parent alleges that the other is "shirking." "Shirking" is an unfortunate term because it connotes improper behavior, but, under the case law, it encompasses behavior that is well motivated. However, we use the term to avoid confusion that might arise if we employed some other term.

¶ 2. Dr. John Warner, the father, asserts that Dr. Jane Chen, the mother, is shirking because she voluntarily and unreasonably declined to return to work after first quitting employment as a medical doctor and then watching her investment income dwindle. Instead of returning to work, Dr. Chen, who had more than a year earlier quit work to devote time to parenting, sought an order for child support from the circuit court. Dr. Warner asserts that the circuit court erred when it determined that Dr. Chen was not shirking and used her actual income to determine child support. We affirm the circuit court.

## I. Background

¶ 3. Dr. Jane Chen and Dr. John Warner have three daughters, born on October 11, 1991, April 22, 1993, and July 12, 1995. In 1999, after an eighteen-year marriage, the parties divorced.

¶ 4. The parties entered into a marital settlement agreement, which was later incorporated into the judgment of divorce. The parties agreed to joint custody, equal physical placement, and no child support. At the time of the divorce in 1999, both parents were employed as medical doctors in Marshfield. Dr. Chen was earning $19,670 per month, which means an annual income of $236,040. Dr. Warner was earning $21,371 per month, which translates into an annual income of $256,452.[1]

¶ 5. Prior to and after the divorce, both parties worked full time. After persistent and unsuccessful efforts to obtain a part-time schedule so that she could spend more time parenting, Dr. Chen voluntarily quit in

---

[1] There are discrepancies in the record regarding income amounts at various points in time. None of the differences in the numbers affect our decision.

May of 2000. By quitting, Dr. Chen gave up her substantial current income, contributions to her retirement plan, and job security. The undisputed testimony was that she was performing at a high level and was the administrator of a profitable department. If Dr. Chen had remained in her job, she would have made $410,175 in 2002.

¶ 6. At the time Dr. Chen quit in 2000, she was advised, based on market returns over the past fifty years, that she could expect approximately 10% per year income on her investments with a conservative investment plan. Since Dr. Chen had about 1.1 million dollars in savings, she hoped to earn about $110,000 per year. She estimated her budget at $7,000 per month or $84,000 per year.

¶ 7. Unfortunately, the stock market declined dramatically in 2001 and Dr. Chen's investment income likewise dropped dramatically. That year, her total income was $32,000. Thus, Dr. Chen began to invade her principal in order to meet expenses. At the same time, Dr. Chen investigated the possibility of returning to work part-time. She was unable to locate work in the Marshfield area, and she declined to pursue part-time work in communities beyond commuting distance.

¶ 8. In January of 2002, Dr. Chen filed a motion requesting that the divorce judgment be amended to order Dr. Warner to pay child support. At that time, Dr. Warner was earning $472,000 per year and his employer contributed an additional $73,000 per year to Warner's retirement plan. During an evidentiary hearing, Dr. Chen detailed her activities with the children. Those activities are set forth in detail in the discussion section below. Dr. Chen testified that her monthly budget was about $7,000. She asked the circuit court to order child support in the amount of $4,000 per month.

¶ 9. The circuit court determined that Dr. Warner could afford to pay child support and that Dr. Chen was not shirking. The court declined to use Dr. Chen's earning capacity and ordered Dr. Warner to pay $4,000 per month in child support.

## II. Discussion

¶ 10. The only issue on appeal is whether the circuit court erred when it declined to use Dr. Chen's earning capacity and instead used her actual income when determining whether and in what amount to order child support. Dr. Warner alleges "shirking." He asserts that Dr. Chen voluntarily and unreasonably chose to forgo employment and seek child support payments.

### A. Standard of Review and Legal Principles Applicable to Shirking

¶ 11. Courts use earning capacity, rather than actual earnings, to determine child support and maintenance payments when the party in question is shirking. *See Abitz v. Abitz*, 155 Wis. 2d 161, 166, 455 N.W.2d 609 (1990). Shirking is an employment decision to reduce or forgo income that is both voluntary and unreasonable under the circumstances. *Finley v. Finley*, 2002 WI App 144, ¶ 15, 256 Wis. 2d 508, 648 N.W.2d 536; *Sellers v. Sellers*, 201 Wis. 2d 578, 587, 549 N.W.2d 481 (Ct. App. 1996).[2]

---

[2] We state the test as having two prongs even though some cases suggest there are two variations of shirking: those in which a parent voluntarily fails to earn to his or her full capacity *with the purpose of avoiding child support* and those in

¶ 12. The voluntariness of a decision to reduce or forgo income is a question of fact, and we do not disturb a finding of fact unless it is clearly erroneous. *See Smith v. Smith*, 177 Wis. 2d 128, 133, 501 N.W.2d 850 (Ct. App. 1993) (treating whether a parent voluntarily terminated his employment as factual question). A party asserting that his or her reduction in income was involuntary has the burden of proof on that topic. *Id.* at 134.

¶ 13. Turning to the reasonableness prong, we accord "appropriate deference" to circuit court determinations of the reasonableness of decisions to reduce or forgo income. In *Van Offeren v. Van Offeren*, 173 Wis. 2d 482, 496 N.W.2d 660 (Ct. App. 1992), we explained:

> The issue in this case is whether [the child support payor] *unreasonably* terminated his employment at Johnson Wax. The legal standard of reasonableness presents a question of law. Ordinarily, an appellate court need not defer to the trial court's determination

which a parent makes a voluntary and *unreasonable decision* regarding income. *See, e.g., Rottscheit v. Dumler*, 2003 WI 62, ¶ 21, 262 Wis. 2d 292, 664 N.W.2d 525; *Sellers v. Sellers*, 201 Wis. 2d 578, 587, 549 N.W.2d 481 (Ct. App. 1996); *Kelly v. Hougham*, 178 Wis. 2d 546, 555, 504 N.W.2d 440 (Ct. App. 1993). We clarify that cases involving a voluntary decision motivated by a desire to avoid child support comprise one type of case that fits under the general voluntary and unreasonableness standard. That is, reducing income for the purpose of avoiding child support is one of many possible unreasonable reasons to reduce income. If a circuit court finds that a parent's decision to reduce income is motivated, even in part, to avoid child support, that finding supports the conclusion that the decision is unreasonable. Obviously, if child support avoidance is the only reason, the decision is unreasonable.

of a question of law; however, because the trial court's legal conclusion as to reasonableness is so intertwined with the factual findings supporting that conclusion, an appellate court should give weight to the trial court's reasonableness conclusion. We therefore review the trial court's ruling as a question of law, but one to which we must pay appropriate deference.

*Id.* at 492–93 (citations omitted); *accord Sellers*, 201 Wis. 2d at 587. We interpret this standard of review to mean that if the circuit court reached a conclusion that a reasonable court could reach based on the record before the court, we will defer to that conclusion. Deferring to circuit court determinations in family law cases is the norm, and we see no reason to deviate in this instance. Further, we are unable to discern any other meaning from *Van Offeren*. *Cf. Finley*, 256 Wis. 2d 508, ¶¶ 13–15 (treating shirking decision as a discretionary determination).

¶ 14. The burden of showing reasonableness is on the party who reduces or forgoes income. That party has the burden of justifying his or her decision. *See, e.g., Kelly v. Hougham*, 178 Wis. 2d 546, 556, 504 N.W.2d 440 (Ct. App. 1993) ("[A child support payor's] decision to leave a well-paying job to pursue his postgraduate education objectives contributed significantly to the parties' changed circumstances. He must justify his decision in light of his obligations to his children.").

¶ 15. Shirking cases typically speak in terms of shirking as an issue involving the payor. *E.g., id.* at 555; *Smith*, 177 Wis. 2d at 136; *Van Offeren*, 173 Wis. 2d at 492 ("Shirking is established where the obligor intentionally avoids the duty to support or where the obligor unreasonably diminishes or terminates his or her income in light of the support obligation."). However,

shirking analysis also applies to a payee. *See Finley*, 256 Wis. 2d 508, ¶¶ 12–13 (applying shirking analysis to a payee).[3]

¶ 16. In this case, the voluntariness of Dr. Chen's decision is not disputed. We address only the reasonableness of her decision.

*B. The Reasonableness of Dr. Chen's Decision*

¶ 17. Dr. Warner, the party ordered to pay child support, makes only one argument on appeal. He asserts that the circuit court erred when it declined to use Dr. Chen's earning capacity when determining whether and in what amount to order child support.

¶ 18. We begin by clarifying the "decision" at issue. Dr. Chen made decisions at two points in time. In 2000, she voluntarily quit her full-time job after failing to obtain an agreement from her employer allowing her to work reduced hours. At that time, Dr. Chen had the expectation that her savings of more than one million dollars would produce sufficient income to meet her child support obligations. In 2001, after steep declines in the markets and her investment income, Dr. Chen explored part-time work options. During this latter time period, Dr. Chen opted not to pursue work oppor-

---

[3] The reader is cautioned that the determination of the income capacity of incarcerated persons for purposes of child support is not amenable to normal shirking analysis. *See Rottscheit*, 262 Wis. 2d 292, ¶ 38 (shirking analysis is inapplicable when the obligor is incarcerated for crimes unrelated to the avoidance of paying child support because "[i]n such cases, the unreasonable decision is to commit a crime, not to reduce income or avoid child support."); *see also Voecks v. Voecks*, 171 Wis. 2d 184, 187–88, 491 N.W.2d 107 (Ct. App. 1992).

tunities that would take her away from the children every other week. When she failed to locate part-time work that would not significantly interfere with her parenting, Dr. Chen sought child support from Dr. Warner.

¶ 19. Dr. Warner argues that both decisions, individually and collectively, constitute shirking. Dr. Chen contends that both decisions were reasonable. We, however, conclude that the appropriate focus is on Dr. Chen's most recent decision to remain unemployed.

¶ 20. So far as this record reveals, if Dr. Chen's investment plan had worked, she would not have sought child support. Moreover, Dr. Warner himself argues that regardless the reasonableness of Dr. Chen's initial decision, it was unreasonable for Dr. Chen to seek child support rather than return to work when her investment income dropped. Dr. Chen does not argue that there is no work available. As discussed below, it is undisputed that Dr. Chen could likely find work if she were willing to work in a far-off community every other week. What Dr. Chen does assert is that it was reasonable for her not to pursue such opportunities because of the benefit conferred on the children by her ability to parent when the children were not actually under the care and supervision of Dr. Warner. Thus, the pertinent question is whether Dr. Chen's decision not to pursue available work that would take her away from the children every other week was reasonable.

¶ 21. The determination of reasonableness does not involve a "set list of factors." *Wallen v. Wallen*, 139 Wis. 2d 217, 225, 407 N.W.2d 293 (Ct. App. 1987). Rather, courts must look to the particular circumstances of each case. The parties here debate the following factors: (1) Dr. Chen's motives; (2) whether her decision was reasonable because it was foreseeable

at the time of the divorce; (3) whether Dr. Chen pursued opportunities; (4) Dr. Warner's ability to pay child support; and (5) the benefit to the children. We address each of these factors in the sections below and then explain why the circuit court's determination that Dr. Chen was not shirking is supported by the record.[4] Before proceeding, we pause to respond to the dissent's sua sponte suggestion that this case be remanded so that the circuit court may consider whether Dr. Chen should be required to spend down some portion of her assets, rather than receive child support. We stress that it would have been reasonable for the circuit court to analyze Dr. Chen's financial situation with an eye toward assessing whether she should spend down assets before receiving child support. However, Dr. Warner has never made the argument, and we cannot fault the circuit court for failing to address it.

### Dr. Chen's Motives

██

¶ 22. Dr. Warner does not argue that Dr. Chen acted in bad faith or with improper motives when she declined to pursue job opportunities after her investment plan failed. At the same time, Dr. Warner points

---

[4] Dr. Warner states that the circuit court "seemed to apply" an erroneous standard of law by requiring bad faith or intent to avoid support as a prerequisite to finding shirking. We are not persuaded. Our attention is directed to the following single reference by the circuit court to Dr. Chen's intent: "That the market fell, and fell so badly, does not convert Chen's innocuous, even benevolent decision, into malevolent shirking." We do not interpret this statement as an indication that the circuit court believed it needed to find malevolence in order to find shirking. Rather, the court is observing that malevolent intent does *not* exist. If it did, such intent would weigh in favor of shirking.

out that shirking may exist in the absence of bad faith or improper motives. We agree. Even when a reduction in income is voluntary, "no bad faith need be shown for an order to be based on that spouse's earning capacity, rather than his or her actual present earnings." *Roberts v. Roberts*, 173 Wis. 2d 406, 411, 496 N.W.2d 210 (Ct. App. 1992); *see also Van Offeren*, 173 Wis. 2d at 496.

¶ 23. We turn to Dr. Chen's argument that her good motivations should weigh in favor of a reasonableness finding. Dr. Chen details evidence showing that she sacrificed much to become a full-time parent and, therefore, she must have had the children's benefit in mind, not her own. This, she contends, supports the circuit court's non-shirking decision.

¶ 24. We conclude that Dr. Chen's motivation is important, but only to the extent that it is undisputed that she was not improperly motivated. As we explained in footnote 2, a finding that an income reduction decision is motivated by a desire to avoid child support is one of many possible unreasonable reasons to reduce income. At the same time, good motives, standing alone, do not necessarily weigh in favor of reasonableness. Even well-motivated persons make unreasonable decisions.

¶ 25. To be clear, we do not hold that good motives are never relevant. Good motives may be relevant when the existence of such motives makes it more likely that some other factor does or does not exist. For example, the undisputed facts here show that Dr. Chen was actually motivated by a desire to help her children by being a much more active parent. Because benefit to the children is an issue in this case, a court might find that Dr. Chen's motivation to help the children with school issues makes it more likely that she will continue to spend substantial time assisting the children in that

respect. However, in this case, there is no factual dispute on that topic. Dr. Warner has not suggested that any of Dr. Chen's testimony about her activities with the children is untrue or exaggerated. He does not suggest that her activities are a subterfuge of any type.

¶ 26. Furthermore, we do not hold that good motives, by themselves, never directly support a finding of reasonableness. Rather, we simply fail to discern any reason why Dr. Chen's good motives are relevant to the determination of shirking in this case.

*Expectation Prior to the Divorce*

¶ 27. Dr. Chen argues that her decision is reasonable because the marital settlement agreement contemplated that child support would be ordered if there were a significant change in income. Dr. Chen also argues that Dr. Warner knew, prior to and during the pendency of the divorce, that Dr. Chen was interested in part-time status and that such a change might result in Dr. Warner paying child support. We agree with Dr. Warner that neither of these arguments has merit.

¶ 28. The language in the marital settlement agreement does not assist Dr. Chen. It provides: "The parties' waiver of child support is based upon the parties' present income and, if there is a substantial change in their relative incomes, it is recognized that the child support provisions may be modified within the discretion of the court." This language simply acknowledges that a substantial change in income might, at a party's request, prompt the court to revisit child support. It sheds no light on whether Dr. Chen's voluntary decision to reduce her income was reasonable.

¶ 29. We turn our attention to Dr. Chen's argument that her decision was reasonable because Dr. Warner knew before the divorce that Dr. Chen was

interested in part-time work so she could spend more time with the children. Dr. Chen points out that Dr. Warner knew this before he signed off on the marital settlement agreement.

¶ 30. There is indirect support for the proposition that, when a reduction in income is jointly contemplated during marriage, a later decision to reduce income in accordance with such understanding weighs in favor of a reasonableness finding. *See Sellers*, 201 Wis. 2d at 588 (a parent's decision to reduce income "represent[ed] a diversion neither [parent] anticipated at the time of the marriage"). But that is not the situation here. There is no record of an agreement during the marriage that Dr. Chen would eventually reduce her hours to facilitate more parental involvement. We conclude that Dr. Warner's knowledge that Dr. Chen was interested in reducing her hours does not make Dr. Chen's decision to remain unemployed more reasonable.

### Dr. Chen's Employment Opportunities

¶ 31. Dr. Warner asserts that Dr. Chen made "only minimal efforts to obtain part-time employment, when confronted with her declining investment income." Dr. Chen asserts that there were no jobs available that would permit her to continue parenting in the manner she believed was most beneficial to her children. This dispute requires clarification because the parties are, in effect, arguing past each other.

¶ 32. The underlying facts are not in dispute. Since quitting her full-time job, Dr. Chen has continually sought part-time employment in the Marshfield area. However, she declined to pursue part-time jobs that would have taken her completely away from the

children every other week. For example, Dr. Chen believed that she could have obtained work as a "temp" doctor every other week in communities such as La Crosse, Green Bay, Milwaukee, or Janesville. But, according to Dr. Chen's undisputed testimony, none of these jobs were within a reasonable commuting distance. Taking any of these jobs would have meant that Dr. Chen would be largely unavailable to her children every other week.[5]

¶ 33. Thus, the question is not whether Dr. Chen failed to vigorously pursue available work. The question is whether Dr. Chen's decision not to pursue available work that would take her away from the children every other week was reasonable.

### Dr. Warner's Ability to Pay

¶ 34. We next address Dr. Warner's ability to pay child support. Dr. Warner does not argue that his ability to pay is irrelevant for purposes of determining reasonableness. For that matter, Dr. Warner does not argue that he cannot afford to pay child support. Rather, Dr. Warner argues that Dr. Chen should not be able to engage in the "luxury of reduced employment simply because [Dr. Warner] earns income sufficient to support the family." Dr. Warner states: "If Dr. Chen's decision [not to earn income] appears reasonable at all, it is only

---

[5] It may be that taking work on a "temp" basis would carry with it additional complications and expenses that might weigh in favor of Dr. Chen's decision. However, Dr. Chen has not detailed such complications in either her testimony or her argument. Since Dr. Chen has the burden of demonstrating that her decision is reasonable, we decline to consider anything more than the fact that such work would take Dr. Chen away from the children every other week.

because there was another high-income child support obligor waiting in the wings."

¶ 35. Dr. Warner does not argue that his ability to pay child support is an inappropriate consideration for purposes of shirking analysis. Obviously, if one working parent has no ability to pay additional child support, the other parent's voluntary decision to remain unemployed would not likely be reasonable. Conversely, if the other parent can easily afford child support, that factor may weigh in favor of the reasonableness of a parent's decision to remain unemployed. We conclude that ability to pay child support is an appropriate shirking factor, but the weight to be given this factor, if any, will necessarily vary from case to case.

¶ 36. Because Dr. Warner's income is so high, our consideration of this factor is much simplified. Dr. Warner's income and retirement benefit, approximately $545,000 per year, are sufficiently high that he is able to afford any reasonable level of child support without significant detriment to his lifestyle or his ability to provide for himself or his children now or in the future.

¶ 37. At lower income levels, complicated questions may arise as to how to analyze "ability to pay." A divorced parent who voluntarily reduces income does not know whether or in what amount the other parent will be ordered to pay child support. In cases where the incomes involved are neither clearly high enough nor clearly low enough to reach a predictive determination of ability to pay, does the reasonableness prong of shirking analysis intertwine with the amount eventually ordered? Dr. Chen effectively answers that question yes when she stresses that Dr. Warner can easily afford to pay $4,000 per month in child support. We do not address the topic.

¶ 38. We are not persuaded by Dr. Warner's argument that Dr. Chen should not be able to engage in the "luxury of reduced employment simply because the other parent earns income sufficient to support the family." This argument ignores the work involved in the active parenting of three young school-age children. More importantly, Dr. Chen did not quit "simply" because of Dr. Warner's ability to pay. If she had, her decision would not even arguably qualify as reasonable.

¶ 39. We turn to Dr. Warner's "race to resign" argument. For purposes of this argument, Dr. Warner focuses attention on the fact that both he and Dr. Chen were high-income earners at the time Dr. Chen quit her job. Dr. Warner argues that a decision in favor of Dr. Chen would encourage "dual high-income [divorced parents] to engage in a race to retirement or resignation." In Dr. Warner's view, the first-in-time parent to resign wins the race and unilaterally forces the other parent to foot the bill.

¶ 40. Dr. Warner's prediction, however, seemingly assumes that the "winner" maintains substantially the same lifestyle without the burden of employment. However, even with respect to the temporary time period child support is awarded, Dr. Warner presents an unlikely scenario, because a parent who resigns cannot expect payments that amount to disguised maintenance.

¶ 41. Further, Dr. Warner's "race to resign" argument assumes there are substantial numbers of dual high-income divorced parents who want to, and are actually willing to, quit a career to become a full-time parent. Dr. Warner does not support this speculation. As the facts recited in the background section of this opinion exemplify, a person who drops out of a career for several years to parent typically gives up substantial

459

financial security and prestige. He or she also faces an uncertain return to the workforce. Will a job be available in the same geographic location? Will the parent need to restart his or her career in an entry-level job? Will the decision to parent be viewed later as a lack of commitment by prospective employers? We also note that there is no indication Dr. Warner has any interest in quitting his job. That is, there is no reason to think that, if Dr. Warner had realized he could beat Dr. Chen to the punch by resigning first and seeking child support, he would have done so.

### Benefit to the Children

¶ 42. Both parties contend that a proper "shirking" consideration in this case is the benefit the children derive from Dr. Chen's decision to remain unemployed. We agree this is an appropriate factor. *See Kelly,* 178 Wis. 2d at 558. The parties do, however, dispute whether the benefit to the children is significant enough to make Dr. Chen's decision reasonable. In this section, we set forth the evidence bearing on the benefit to the children.

¶ 43. The record reveals that, prior to the time Dr. Chen quit, Dr. Chen's and Dr. Warner's involvement with the children was fairly typical of dual full-time working parents with high incomes. Both parents attended school and pre-school functions when they could, but not regularly. They hired a nanny to assist with the children. For the most part, one or both parents were available at dinnertime, after dinner, and on weekends. Dr. Warner, who still works full-time, attends parent-teacher conferences, attends some of the children's school activities, and spends as much as three hours a night assisting with homework during the

weeks the children are with him. Dr. Warner schedules substantial vacation time with the children.

¶ 44. The physical placement is equal: the children spend every other week with each parent. Dr. Chen's involvement with the children has increased substantially since she quit her job, both during the weeks she has placement and the weeks she does not. Dr. Chen provides volunteer services in each of the children's classrooms and acts as a driver or chaperone for nearly all of their class field trips. Dr. Chen's involvement in these activities has allowed her to develop a close working relationship with each of the children's teachers. This, in turn, gives her the opportunity to deal quickly with areas of concern that might arise. For example, Dr. Chen testified that one daughter is "extremely sensitive and she will burst into tears in school." Dr. Chen explained that she was able to explain to the teachers "what causes it and what to do when it happens and that it's – it's something that has decreased over time." As another example, Dr. Chen testified that she was able to work with teachers on another daughter's "organizational problems."

¶ 45. Dr. Chen has also become very active in the children's non-school activities. These activities include dance, tae kwon do, piano, swimming, and knitting. Dr. Chen takes the children to all of these activities each week and usually stays to see how they are doing and to monitor their participation. Dr. Chen helps the children with piano by helping them with music theory and helping them prepare and practice for recitals and competitions.

¶ 46. Dr. Chen gave an example of an opportunity she thinks would not have been pursued if both she and Dr. Warner still worked full time. One of their daughters was interested in an advanced art program. Dr.

461

Chen met with the daughter's art teacher, decided which pieces of art to submit, had the art matted and framed, and took the daughter to the three-hour screening test.

¶ 47. Dr. Chen testified that her involvement enables her to get to know her daughters' friends and the families of those friends. Dr. Chen testified that she makes arrangements for her daughters to play with friends and she also steers the children away from possible trouble. Dr. Chen gave as an example one daughter who wanted to sleep over at a friend's house. Dr. Chen was familiar with the family and knew that the parents did not supervise their children, that the parents were heavy smokers, and that the home was "extremely dirty." Dr. Chen concluded that the sleepover was not a "safe arrangement." She spoke with her daughter about it and the daughter agreed it would not be a good idea to spend time at that girl's house.

¶ 48. Dr. Chen testified that she had recently spent time looking for a child-friendly church and found one that fit their needs. The girls now attend church services and Sunday school and have recently gone to a "vacation Bible school."

¶ 49. Dr. Warner did not argue below, and does not argue before this court, that Dr. Chen's testimony is inaccurate or that the examples she gives do not constitute benefits to the children. Rather, Dr. Warner argues that the benefits are limited. Dr. Warner relies on his own uncontested testimony that the children were thriving *before* Dr. Chen quit working. He accurately points out that there is no evidence in the record that any change occurred requiring Dr. Chen to quit work to care for the children. Dr. Warner testified: "I think that the care provided during the day by their long-term nanny combined with our care in the evening

when we returned from work was doing a very good job of raising them." Dr. Warner also notes that the children were all school age with no special needs at the time Dr. Chen declined to return to work and instead sought child support.

*Application of Factors*

¶ 50. In the subsections above, we conclude that neither Dr. Chen's good motives nor Dr. Warner's knowledge that Dr. Chen was considering reducing her hours weighs in favor of finding Dr. Chen's decision to forgo all employment reasonable. We also explain that Dr. Chen, as of the time of the hearing, did not have employment opportunities that would permit her to supervise and assist the children during the weeks they have placement with Dr. Warner. Indeed, the question here is whether it is reasonable for Dr. Chen to forgo part-time work so that she can parent during the weeks she does not have placement. Accordingly, we focus on Dr. Warner's ability to pay and the benefits the children derive from having Dr. Chen available every week.

¶ 51. Dr. Warner's main argument regarding the benefits to the children is that the children were doing well before Dr. Chen quit and they are doing well now. He also states that the benefit of having a full-time parent is substantially less when children are, as here, school age. These arguments have merit but, at the same time, the benefits described by Dr. Chen, though difficult to measure, are significant. It is hard to argue with the proposition that children benefit when parents know who their friends are and actively steer the children away from bad influences. Similarly, even high-performing children may encounter difficulties in school or miss opportunities for enrichment. Thus, a reasonable judge could find that Dr. Chen's efforts

benefit the children and that benefit is enhanced by Dr. Chen's ability to supervise and assist every week, not just every other week.

¶ 52. Dr. Warner argues that Dr. Chen, in effect, asks this court to make a general value judgment and adopt a blanket rule elevating stay-at-home parenting over income-earning, regardless of the placement schedule and the other particular facts of the case. We do nothing of the sort. We readily acknowledge that it is difficult to assess the comparative benefits of Dr. Chen working every other week and not working at all. Further, this is not a case in which either party offered expert testimony or statistical evidence of the short- or long-term benefits to school-age children from having an active, involved full-time parent such as Dr. Chen. We hold only that, in this case, a reasonable trial judge could determine that Dr. Chen's decision to forgo part-time work—work that would take her away from the children every other week—was reasonable in light of Dr. Warner's ability to pay child support and the benefits to the children.[6]

---

[6] The dissent worries that too much will be read into the majority opinion; that this case will be read as generally holding that a spouse may quit working whenever the other spouse is able to pick up the financial slack. That is not the holding of this case. This decision is publishable, not because it sets forth a general rule regarding the result that should be reached in this type of case, but because it clarifies the analysis that should be used. We very clearly state that the result in this case is a reasonable one, not the only reasonable one.

We will not take the time to dispute all of the assertions in the dissenting opinion, but one additional passage is hard to ignore. The dissent states: "We are deciding that the more money spent on children, the greater benefit to the children, and that the more activities children engage in, the better the child and ultimately the better the adult." The majority opinion

464

*By the Court.*—Order affirmed.

¶ 53 DYKMAN, J. (*dissenting*). Dr. Chen is a millionaire.[1] Dr. Warner is a millionaire.[2] They were divorced in 1999, and share equally in the placement of their three children, each parent having physical placement of the children during alternating weeks. Until this post-divorce proceeding, neither party paid the other maintenance or child support, and each paid for the children's care when they were with them. Dr.

does nothing of the sort. Nothing in this opinion suggests that more money produces better children. Indeed, Dr. Chen's decision not to return to work reduces the amount of money available for the children now and in the future. Also, there is no suggestion that more activities result in better children. The children in this case would have been involved in their many activities, regardless of Dr. Chen's work schedule.

[1] At the time of her divorce, Dr. Chen's November 1999 financial disclosure statement showed a net worth of $1,712,408. Her April 2002 financial disclosure statement showed a net worth of $1,691,000, a loss of $21,408 since 1999. There was no testimony as to the effect on value caused by some of the assets being held in pre-tax accounts.

[2] At the time of his divorce, Dr. Warner's November 1999 financial statement showed his net worth as $1,712,408, the same as Dr. Chen's. His March 2002 financial disclosure statement shows that he owns an automobile valued at $23,225, checking and savings accounts valued at $132,444 and real estate with equity of $408,200. Originally appended to his 2002 financial disclosure statement were attachments A through D, which listed the value of his tangible personal property, securities and two retirement accounts. The attachments are no longer appended to the financial disclosure statement. I conclude, however, that with a net worth of $1,712,408 in 1999 and income which increased from $230,000 in 1999 to $545,000 in 2002, Dr. Warner's 2002 net worth exceeds a million dollars. There was no testimony as to the effect on value caused by assets held in pre-tax accounts.

Warner has remarried. The record does not include the income of Dr. Warner's wife. Dr. Chen lives with a significant other, whose income for 2001 was $8,049.

¶ 54. In May of 2000, Dr. Chen retired, at age forty-three. She testified that she did so to stay home with her children. Had she not retired, her 2002 gross income would have been $405,491. She testified that because her securities had decreased in value, she needed more income. She estimated her household budget at $5,000 per month, and wanted Dr. Warner to pay $4,000 of that. Dr. Warner did not submit a budget showing the cost of supporting the children for the half-year they were with him. The trial court granted Dr. Chen's motion and ordered Dr. Warner to pay child support of $4,000 per month.

¶ 55. The majority affirms this result, deferring not to the trial court's determination that Dr. Chen's decision to retire was reasonable, but instead concluding that a reasonable judge could conclude that Dr. Chen's decision not to seek part-time work was reasonable. I question the reasonableness of a decision to retire at age forty-three and depend upon income from securities. Those securities were valued at a time when even poorly informed persons knew that the stock market had reached an all-time high. There is no evidence of the type of securities Dr. Chen held when the stock market declined. But, given Dr. Chen's testimony that she sought the advice of a financial consultant before retiring, I do not take issue with the majority's conclusion that we need not examine Dr. Chen's initial decision to retire. But I disagree with the majority's decision of what to review and the standard of review it uses to review later action (or inaction) of Dr. Chen.

¶ 56. To begin with, this opinion will be published, and therefore become precedent for future reduction of income cases which will almost never involve parents with the net worth, income and income potential of Dr. Chen and Dr. Warner. Though the majority disclaims that use, the reason for publication belies that disclaimer. *See* WIS. STAT. § 751.42(2) (2001–02) (Stating that officially published opinions of the court of appeals shall have statewide precedential effect.). The use of a "shirking" analysis here really does not matter because both parties could support their children without the other, using their income or their assets. But applying the holding here to cases involving persons of more modest means raises questions of public and social policy that need more analysis than the majority gives.

¶ 57. The result of a case is often driven by the standard of review used. The majority uses a deferential standard, concluding that a reasonable trial judge could reach the result found here. Assuming that the "reasonableness" of Dr. Chen's decisions is the test, "reasonableness" is a question of law. *A.Y. v. Ronnie J.*, 2004 WI App 58, 271 Wis. 2d 242, 677 N.W.2d 684. I recognize the "intertwining" exception to this conclusion, but here there is no intertwining. Instead, what we are really deciding, based on our own knowledge and beliefs, is that children raised by stay-at-home parents become better children, students, citizens and adults. We are deciding that the more money spent on children, the greater benefit to the children, and that the more activities children engage in, the better the child and ultimately the better the adult. We are deciding that a divorced parent can make a unilateral decision to retire that would be a joint decision in most marriages. While I intuitively agree with some of this, if judges are going to make those policy decisions without evidence, I

question whether the answer to those decisions should depend upon which circuit judge is making the decision.[3] So, were I writing for a majority, I would not use a deferential standard of review, but review cases of this sort de novo.[4]

¶ 58. I would also review Dr. Chen's decision differently. The majority focuses on Dr. Chen's decision not to actively seek part-time work. That is not my analysis. Though I do not take issue with her decision to retire in 2000, the question for me is whether her decision not to return to full-time work is reasonable. Dr. Chen worked full time until shortly after she divorced. We do not know how either Dr. Warner's wife or Dr. Chen's significant other interact with the children, or what parenting benefits they can or will provide for them. We do not know whether Dr. Chen would obtain full-time work if she sought it.

¶ 59. Nor do I discount Dr. Warner's "race to resign" concern. I do not share the majority's disbelief that this will occur. Of course there are benefits and detriments to any career decision. I believe, however, that some persons who find working outside the home stressful and unrewarding will be willing to trade that lifestyle for what they perceive as a more leisurely lifestyle. Their willingness may be enhanced if they can

---

[3] Faced with arguably similar facts, a trial court judge in Missouri imputed income to an unemployed custodial parent who had left lucrative employment as a physician, giving as a primary reason her desire to be home with her children. The Missouri Court of Appeals affirmed. *Stanton v. Abbey*, 874 S.W.2d 493, 500 (Mo. Ct. App. 1994).

[4] I do not suggest a de-novo standard if voluntariness is a part of a "shirking" analysis. Whether an action is voluntary in cases of this sort involves credibility and choosing between disputed facts. A deferential review acknowledges these factors.

make a unilateral decision and place the economic burden on another. While the majority disclaims any universality to its holding, the message is that if the income or assets of an ex-spouse are sufficient, retirement at an early age accompanied by evidence of child rearing activities will achieve the expected result. If the non-retiring spouse is wealthy enough to fund the retiring spouse's decision, the desire of the non-retiring spouse not to pay what can be hidden maintenance is not considered.

¶ 60. Ultimately, I conclude that the majority's "shirking" analysis is unsuited for a case such as this one.[5] A better one would be this: The decision to retire at an early age while obligated for child support is disfavored. Nonetheless, courts should accept that decision as long as the retiring parent has sufficient assets or income to meet the expected support obligation. The retiring parent will be required to use income and to liquidate his or her assets before requiring the non-retiring spouse to support the retiring spouse's unilateral decision to retire.

¶ 61. I agree with the majority that "shirking" is an unfortunate term, better suited for cases where a support payer is unemployed or has changed jobs. Yet, the majority has shoehorned this case into a "shirking" analysis. The result is an inquiry into the reasonableness of Dr. Chen's actions without considering Dr. Warner's desire not to be bound by Dr. Chen's unilateral decision, and not to pay for Dr. Chen's retirement. Of course, both Dr. Chen and Dr. Warner are ultimately

---

[5] The supreme court concluded that a "shirking" analysis was inapplicable to a request for support modification where the requester was incarcerated resulting from a criminal conviction. *See Rottscheit v. Dumler*, 2003 WI 62, 262 Wis. 2d 292, 664 N.W.2d 525.

responsible for their children's support. That overrides either of their economic interests.

¶ 62. Were I writing for a majority, I would remand to permit the trial court to inquire further into Dr. Chen's income and to consider her $1,691,000 estate. The trial court, using the test I have suggested, would consider the nature of Dr. Chen's assets, and when they would probably be exhausted. If Dr. Chen is capable of supporting her decision to retire, the trial court should require her to do so. If and when she is not, Dr. Warner should be prepared to assume his children's economic needs. Because the majority does not reach this conclusion, I respectfully dissent.